Filed 3/5/26

**CERTIFIED FOR PARTIAL PUBLICATION\***

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIRST APPELLATE DISTRICT**

**DIVISION ONE**

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KRISTHIAM UCEDA,<br><br>        Defendant and Appellant. | A168345<br><br>(Contra Costa County<br>Super. Ct. No. 05001900844) |

A jury convicted Kristhiam Uceda of murdering Lawrence Janson during a confrontation near Janson's high school (Pen. Code, § 187, subd. (a)) and of shooting J.R.—a bystander to a different confrontation at a park— from a motor vehicle (*id.*, § 26100, subd. (c)). Uceda claims the trial court prejudicially erred by failing to instruct the jury on lesser included offenses to both crimes, and challenges the sufficiency of the evidence that the shooting of J.R. was committed for the benefit of a criminal street gang (*id.*, § 186.22, subd. (b)).[1]

We agree that the trial court prejudicially erred in its instruction concerning the shooting of J.R. and reverse Uceda's conviction under section

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II(A)(2).

[1] Undesignated statutory references are to the Penal Code. In their briefing, both parties incorrectly state that the jury found the gang enhancement true as to both of Uceda's crimes. In fact, the jury found the enhancement not true as to Janson's murder.

1

26100, subdivision (c).  On remand, the People may elect to retry Uceda on that charge, or to stand by his conviction on the lesser included offense of grossly negligent discharge of a firearm (§ 246.3, subd. (a)).  In all other respects, we affirm.

## I.  BACKGROUND

Uceda moved to the United States from El Salvador in 2013 and attended Mt. Diablo High School (Mt. Diablo) in 2014 and 2015.

In the fall of 2017, Uceda was 20 years old and was not attending high school.  He was living with his cousin's 16-year-old friend, H.C., and H.C.'s family.  H.C. had also attended Mt. Diablo but had transferred to another school.

Janson was a student at Olympic High School, which is four blocks away from Mt. Diablo and in the same school district.  Janson had also attended Mt. Diablo, from about 2014 to 2016.

### A.  Conflict Among Students at Mt. Diablo

K.G., known as "Panda," had also attended Mt. Diablo during the prior school year.  Before he arrived as a transfer student, some Mt. Diablo students were members of the Norteño gang, which is associated with the color red, "but not a lot" were members of the Sureño gang, which is associated with blue.  There were no fights between the two groups.

When K.G. arrived, he kept company with three other Mt. Diablo students—M.U., Y.P., and J.A.—as well as Uceda, who would pick the group up from campus.  The group began "wearing El Salvadorian-like soccer jerseys and colors, blue colors often."  "[T]he way they walked and postured . . . changed."  Another group of students "usually wore red," and after K.G. arrived, "these two groups" would "give dirty looks to each other, and fights started happening."  After a student who associated with the Norteños

2

"walked up to [K.G.]" one day and "started punching him," confrontations and fights between the two groups increased.

School administrators and the resource officer assigned to Mt. Diablo by the Concord Police Department met with parents and students to try to calm the situation. The resource officer testified that Janson "just kind of hung out with" the group who wore red and was not necessarily a member of the group. But Janson did get into a fight with one of the students who wore blue. Janson wore red clothing, but it was "Mt. Diablo clothes, and that's the color of the school." The resource officer met with Janson and K.G. and also with Janson and Y.P. as part of his efforts to resolve the conflict between the groups. After those meetings and a "parent talk," Janson "didn't get into another fight." At the end of the 2016–2017 school year, K.G. left Mt. Diablo and the blue group "kind of just kind of laid low."

## B. Shooting of J.R.

One day in October 2017, Uceda, H.C., Y.P., and K.G. were at a shopping center in Concord in Uceda's black Honda Accord. According to H.C., they noticed a group of 12 to 15 people wearing red, who looked "angrily" at them, as if they wanted to "harm" Uceda's group. Uceda's group believed the others were Norteños. The group in red "came at [them]," and Uceda "just sped up with the car." Uceda then "turned around," and K.G. shot at the group in red with a BB gun.

Uceda's group went to H.C.'s house, where M.U. met them with another car. While the others remained outside, Uceda went into H.C.'s house and came back out with an object "hid[den] . . . inside his sock." The group drove back to the shopping center, with Uceda, K.G., and H.C. in the Honda and M.U. and Y.P. in another car. The group in red was not there.

3

Uceda's group continued to drive around and saw the group in red at Ellis Lake Park. Uceda "went to the other side of the park," told H.C. to drive, and moved to the back seat of the Honda. H.C. drove back to the park while M.U. and Y.P. followed in their car. Y.P. was filming a video in which he said in Spanish, "[W]e came to see some enemies." When H.C. reached a parking lot at the park, Uceda told him to slow down. H.C. heard shots "[o]utside the window," followed by shouting.

One of the shots hit J.R., an unhoused woman who slept at the park, in her shin. She was with friends, and while she noticed another group in the area, there were "always people at the park," and she did not notice what people in the other group were wearing. The shot came from the direction of the main street that J.R. was facing from the parking lot, and she was "pretty sure" it came from a vehicle that she saw. After she was shot, her friends helped her "limp[]" to a bus stop.

An officer arrived and found J.R.'s group at the bus stop and a group of five or six other people in the street, "several" of whom were wearing red. One .22-caliber shell casing was recovered from the area of the shooting. Blood stains were found near J.R.'s personal items on the stairs to a historical home near the parking lot.

Uceda's group went back to H.C.'s house and Uceda carried "something hidden" inside. Uceda then drove the group to San Francisco, telling them "he was going to meet somebody." They "went to a place that sold tacos and food" and Uceda spoke with a group of people, one of whom had an MS-13 tattoo on his leg.

## C. Murder of Janson

One day a few weeks after the shooting at Ellis Lake Park, Janson left Olympic High School with two female friends and his best friend B.G.

4

According to B.G., they walked across the parking lot and when they reached the entrance to the street, a "dark bluish" car "roll[ed] by with two guys throwing gang signs at [them]," "like a M or . . . a W . . . . [L]ike an E or . . ., horns . . . or something." Janson said, "[T]here goes the Salvadorians."

The car went "into the lot" as Janson's group was going out, then exited the parking lot. "[L]ike a few seconds later," Janson's group "heard a pop." They "didn't actually know what the pop was" and "thought . . . the car ran over a bottle cap or maybe a little firework or something." It "sounded like [the guys in the car] were yelling something at" Janson's group. Janson raised his arms with his palms to the sky "like, what the hell." He was wearing a red t-shirt under a sweatshirt. B.G. testified that Janson "might have probably accidentally pulled on his shirt," but "never would do that intentionally." Janson "didn't have any weapons" and B.G. had "[n]ever" seen him with a weapon.

Janson's female friends "were scared" and "didn't want to be there anymore." B.G. and Janson agreed to walk one of them "to BART." As they passed the high school, another car (a "white Acura") drove by and someone "said, 'There goes Panda.'" Panda's car "slowed down" and when "they noticed that it was [Janson's group], they just kept going." B.G. knew who Panda was because when he had visited friends at Mt. Diablo the week before, Panda and others—"apparently the Salvadorians . . . that [Janson] refer[red] to"—taunted B.G.'s group and attempted to "instigate stuff" with them. While he "d[i]n't really know," B.G. "th[ought]" Janson had beat up members of Panda's group in the past.

Janson's group stopped at an intersection because they "were trying to find a ride" and "plan" what they were "going to do." Then, they "saw Panda," and the dark car they had seen before "pull[ed] up." They were "expecting

the driver and the passenger to get out," but instead, "[s]omebody hop[ped] out from the back seat" and "caught [them] by surprise." "[R]ight as soon as" that person exited the car, "he said something about Salvadorian or Salvatrucha or something," and then, " 'I finally got your ass,' or something like that."

Janson was about five feet away from the car. He "squared up," "threw his hands up," said "all right, what's up?," and "trie[d] to go fight" the person who got out of the car. Janson's shirt did not come up. B.G. saw that the person from the car had a weapon, at first thinking it was "like a metal pipe or something," and tried to tell Janson. He took a step as the person pointed the weapon—which turned out to be a gun—at him. The assailant "let one shot off." B.G. was not hit, but "slipped and fell, and then after that," he "heard like a few shots go off, and then [Janson] was just screaming." B.G. "crawled" behind a building as Janson "was just running around." B.G. "went back" to Janson and "told him like, let's hop these fences . . . so we can get back into school campus and maybe get some help."

Janson "was able to climb [two] fences like it was nothing." B.G. "got to the second fence" and tried to ask Janson "where he got shot or what happened." Janson was "not really that responsive," and was "just more like, 'I got shot, I got shot.' " B.G. asked where he had been shot and Janson said, " 'In my back, in my back.' " Janson "tried to lift up his shirt," but "couldn't stand up anymore" and "fell down to the floor." A janitor came out of the high school and B.G. "saw [Janson] start spitting out blood." B.G. "got really mad," "threw [his] backpack and started punching the fence," and then people "pushed" B.G. "into [a] classroom."

When first responders arrived, Janson deteriorated rapidly, and all he said before losing consciousness was, " 'I can't breathe.' " Janson died from

one of three gunshot wounds.  The lethal shot traveled from his back towards his front, fractured a rib, and punctured his left lung and aorta, causing fatal blood loss.

Officers recovered six .22-caliber shell casings from the scene of the shooting, as well as a bullet that had passed through the wall of a nearby business.  Bullets were also recovered from Janson's body.  Nothing that resembled a weapon was located among Janson's clothing and personal possessions—just "keys and a lanyard and a pencil," and a backpack containing "some job applications and some pencils."

## D.  Officers Investigate and Arrest Uceda

Officers surveilled K.G.'s home.  They saw K.G. get into a black car similar to one shown in video recorded near where Janson was shot.  They followed the car and were joined by more officers in a marked patrol vehicle, who stopped the car, a black Honda.  Uceda was the driver, and his El Salvadorian passport was in the car, along with receipts and other papers bearing his name.  There was a BB gun behind the passenger's seat.  Y.P., M.U., K.G., and B.C. were also in the car.  Police interviewed each of them about Janson's murder.

Officers recovered several cell phones from the car.  The case, back plate, and SIM card had been removed from one phone and were also recovered.  One of the phones contained images, messages, and other data associated with Uceda.  That phone also contained images of the El Salvadorian flag with the letters " 'M' and 'S' on the flag"; "an armed, possible military member walking from a wall with the word Salvatrucha on it"; a subject displaying "hand signs" with " 'MS,' and then '13' in Roman numerals, 'for life,' " across the image; and similar media and images.

7

Officers searched Uceda's room at H.C.'s house. They found two El Salvadorian flags, an El Salvadorian soccer jersey, a cardboard box marked with the letters "ES," and two long blue belts, one with a buckle displaying the letter " 'M' " and the other with a buckle displaying the letter " 'S.' " .22-caliber ammunition was in a clear plastic baggie in H.C.'s closet. The ammunition "had a large 'C' for a headstamp," consistent with the casings found at the scene of Janson's murder. At B.C.'s house, officers located a .22-caliber pistol with a magazine containing one live round. The gun was inside a black sock, underneath a mattress.

Within days of the murder, B.G. identified Uceda as Janson's killer from a photo lineup compiled by police. He had seen Uceda before when a mutual friend introduced them at Mt. Diablo.

### E. Uceda is Tried and Convicted

Uceda was charged with Janson's murder (§ 187, subd. (a)) and shooting J.R. from a motor vehicle (§ 26100, subd. (c)). Firearm (§ 12022.53, subd. (d)) and gang (§ 186.22, subd. (b)(1)(C)) enhancements were alleged as to both crimes. The trial court granted Uceda's motion to bifurcate trial on the gang enhancements.

#### 1. *People's Case-in-Chief*

During the first phase of trial, H.C. (who made a plea agreement) testified about the shooting of J.R. as we have described, and J.R. also testified. B.G. testified about Janson's killing as recounted above.

An eyewitness who lived about four homes from where Uceda shot Janson was standing outside near his truck at the time. He described hearing people yell and looking up to see two males and two females facing a fifth person near a black sedan. There was "[a] lot of shouting back and forth, and then the one individual by the car, very calmly, raised his right

8

arm, extended it and had a gun, and then fired four times." The eyewitness identified a person who was not Uceda from a photo lineup as "most similar to" the shooter, but said "he could not be completely sure."

J.A. (who received immunity) drove Uceda to the scene of Janson's shooting. M.U. was in the front passenger's seat of the car and Uceda was in the back. J.A. testified that he was high on methamphetamine and did not realize anyone in the car had a gun. He stopped at a stop sign as Uceda instructed him and then Uceda got out of the car. Uceda was seven or eight feet away from a small group of people who had been walking towards the car. J.A. saw Janson pull up his pants—which he understood to mean Janson was going to fight—and "square[] up to fight," raising his fists. He saw Uceda with a gun, but he "was looking straight" and didn't see Uceda shoot. He heard Uceda yell, " 'Hey, motherfucker MS-13,' " and then he heard gunshots. Uceda got back in the car and the group outside "just ran."

J.A. gave a different account when police interviewed him the day after the shooting, which was presented to the jury. In the interview, J.A. said he saw Uceda put a gun underneath a seat in the car and saw Uceda pull the trigger when he shot Janson. J.A. said that "[M.U.] was on the phone with somebody" who they had called "to tell them they were going to go hit Lawrence." He said M.U., K.G., and B.C. were trying to become MS-13 members. After the shooting, the group went to B.C.'s house and they "were jumping around, kind of hugging, shaking hands," "jubilant, happy, [and] congratulating each other." K.G. gave the gun to B.C. and someone hid it in his house.

The jury heard testimony by an expert in firearm identification. He explained that defects in the gun recovered from B.C.'s house allowed cartridge casings fired from it "to be identified quite readily with one

9

another."  Cartridges test fired from the gun bore "tool marks" matching the defects, as did the casings recovered from the scenes of both shootings. Because the inside of the gun was heavily leaded, it did not produce specifically identifiable tool marks on bullets it fired.  But more general "class characteristics" were consistent between test-fired bullets and the bullets in evidence.

The jury also heard testimony by an expert on "criminal street gangs, specifically MS-13."  He explained that refugees from El Salvador formed MS-13 in Southern California in the 1970s, and members "associate themselves with the color blue" to show "allegiance to the Mexican Mafia" and Sureños, due to the history of these gangs in Southern California.  MS-13 members "often use a bright blue . . . similar to the blue from . . . the El Salvador flag." In the United States, the gang's "main rivals are northern Hispanics," or Norteños, who "align themselves with [the color] red."

The expert explained that "[t]here's a very organized process to joining MS-13," most of which "is pretty universal."  A potential member begins as "like a hang-around," who "is friends or associated with members, whether they go to school," play soccer, or perhaps work together.  This "is like a vetting process" in which the potential member is "invited to hang out, drink with [gang members], go to parties, but . . . they're not involved in anything criminal with the gang."  In the next step, the potential member "is called a parro."  This is "similar to like a pledge in a fraternity where you want to join that organization, . . . but you have to prove yourself in that process."  The parro does this "[b]y submitting acts of violence, whether that's assaulting rival gang members in their territory, defending the gang's territory if rivals happen to be in" it, or by "[p]romoting the gang . . . through intimidation" or "violence."  The parro "listen[s] to members with leadership positions [about]

10

what to do and how to do it." "[E]very set or every clique has almost like . . . standing orders": for example, "if there's a rival in our territory, we're going to commit acts of violence against them" or "[w]e're going to frequently go to rival territories to commit acts of violence."

The requirements to be accepted into the gang vary. In the United States, "you might have to kill one rival gang member or kill another person for the gang, whether that's protecting the reputation of the gang or to protect another gang member." Parros often record these acts of violence and send it to gang leaders "to validate" their acts. Usually a clique leader called "the first word" or "palabra[]" decides whether a prospect will become part of the gang. This may be followed by a "jump-in process" in which "[m]embers of th[e] gang will assault th[e] prospect."

The expert had investigated cases where before or "during [an] act of violence," a gang member would "say the name of the gang and also the name of the clique," as well as the gang member's personal "moniker." This is done to "[p]romot[e] . . . the gang" and, specifically as to MS-13, its "reputation for violence." There are also "wannabe[s]" who "might not necessarily be in [a] gang," but might "think that that gang is cool, so they'll wear the same clothing or try to hang out with those individuals to be a part of that gang." The expert had seen high schoolers display gang signs on social media "and it doesn't necessarily mean they are gang members." A "wannabe" might also yell out a gang's name or a moniker.

2.    *Uceda's Police Interviews*

Video of Uceda's interviews with police was played for the jury. Uceda initially denied going by Olympic High School on the day of Janson's murder and told police that he spent the day with friends in different locations. He

11

said he had never met Janson but saw "on Snapchat" that he had been killed, denying any involvement.

After police told Uceda that "everybody had already told [them] what had happened," showed him a picture of the gun they found, and told him his DNA was on it (which they had not confirmed), Uceda changed his story. He told officers that "he got out of the car, and the gun was just in his hand, and that he was trying to scare [Janson], and it just kind of went off," but he did not "remember why or what happened." He claimed to have found the gun the previous weekend when he left his residence for work and "his attention was drawn by a cat, and he noticed the gun laying in the street." He said that when he first drove past Janson, Janson pulled his pants up, which is a gang sign associated with the city of Pittsburg, and Uceda "fired one round at the ground, and then drove away." Uceda said "he did not remember why" he then went back to re-engage with Janson. He got out of his car, but "he didn't really remember why," and Janson put his fists up. Uceda "didn't remember" shooting Janson, but after he heard Janson scream, that "broke[] his trance." Eventually, he told officers that he hid the gun in a sofa bed at B.C.'s house. Uceda did not say he was afraid for his own safety because of Janson or that he believed Janson had a weapon.

After officers interviewed J.A., Uceda asked to speak with them again. Officers asked about J.A.'s statement that "Uceda had screamed 'MS-13 motherfucker,' and that they were all trying to be MS-13 . . . members." Uceda admitted to making that statement. He said he was not a member of MS-13, but he "want[ed] to be." He said M.U., J.A., and K.G. had also been in fights where they had "yelled that."

3.    *Defense Case*

Uceda testified in his own defense.  He said he was not a member of MS-13 and did not want to be.  His primary friends were not members but some of his other friends were.  He and K.G. thought some MS-13 culture was cool, but "[n]ot all of it."  This is why there was MS-13 imagery on Uceda's phone.  The belts found in Uceda's room were not his; at least one belonged to K.G.

Uceda testified that he had never seen Janson in person before the day of the shooting and did not like or dislike him.  That day, he went to Olympic High School to pick up J.A.  When he first saw Janson, Janson "began yelling out things and making signs."  Uceda "lowered the window" of his car and "fired towards the ground," thinking he and his associates "could scare [Janson], and then [they] could leave."  Uceda's group went to J.A.'s house and J.A. "asked [Uceda] if he could drive."  Uceda agreed.  J.A. decided to go back to Olympic High School; Uceda did not know why or want to go back.  When they returned, Janson was "making signs at [them] like he want[ed] to fight with [them]."

Uceda testified that when he got out of the car, he "didn't have any intention" and "simply reacted by getting out."  Later, he said he intended to fight Janson but not to kill him.  Janson was 10 to 15 feet away.  "He kept lifting up his hands" into fists and "started grabbing at his pants" and, "all of [a] sudden," Uceda "saw that he had [a] blade in his hand."  Uceda "simply got scared," and he "remembered that [he] had the gun."  Holding the knife, Janson approached Uceda.  He was facing Uceda when Uceda "pointed [the gun], and that's when [Uceda] heard the shot."  Then, he "thought [he] was hearing an echo to the first shot," but "guess[ed] it was more shots."  He did not remember what happened "after [he] fired the first shot," but "believe[d]"

13

he pulled the trigger five times.  Then he heard Janson "scream, and then [he] realized somebody was calling [him] from inside the car, and [he] went inside the car."

Uceda did not know what happened to Janson's knife, and he was not happy or proud or trying to impress a gang by shooting Janson.  His group went to B.C.'s house and "somebody grabbed [the gun] to hide it."  Uceda "went home, and . . . was crying," and "didn't know what to do."  When police interviewed him, he lied and did not mention the knife "[b]ecause [he] was scared, and [he] didn't think it was important," and "also didn't think that [he] would be believed."  He lied about a cat leading him to the gun and not being involved in Janson's murder.

Uceda also testified about the shooting at Ellis Lake Park.  He recounted running into the group in red at the shopping center and said they were "flashing signs" and "not friendly."  K.G. made an MS-13 sign at them, "fired at them with a BB gun," and said he had hit someone.  Uceda's group went to his residence and Uceda got his gun "[j]ust to have it for protection."  They were "going to go to San Francisco," but K.G. "said the Nortenos are at the park" and "he was going to fire again at them."  K.G. took the gun but did not fire it, and H.C. began driving Uceda's car.  When they "went back to the park," Uceda "fired into the air."  Then, when he "stuck [his] hand outside the window, [he] hit against the window, [his] hand went outside, and [he] fired another shot."  Uceda explained that he "just wanted to fire into the air to impress" his friends.  "There was nobody at the parking area" where he fired, and he did not intend to fire the second shot.  He heard someone scream, but thought it was a man.  He did not know J.R. or want to shoot her.

On cross-examination, Uceda testified that he "provided money for [the gun] to be purchased" after K.G. suggested they buy one.  Uceda "believe[d]"

14

that when they went back to Ellis Lake Park, K.G. said he wanted to shoot the group in red again with his BB gun, and Uceda responded that they "had a real gun." K.G. put the magazine in the gun backwards and Uceda laughed at him. Uceda "believe[d]" he did meet with one or two MS-13 members in San Francisco after this shooting. One gave him food. Someone showed the MS-13 members a video of the shooting, which Uceda did not know about until they got to San Francisco. He "believe[d]" his group's demeanor was happy and felt he had earned the respect of the MS-13 members, but he was sad about the shooting.

4. *Jury Verdicts*

After the first phase of trial, the jury convicted Uceda of second degree murder and shooting from a motor vehicle and found firearm enhancements true as to both offenses.

In the second phase, the People presented evidence about predicate offenses committed by other members of MS-13 and argued that Uceda committed both Janson's murder and the shooting at Ellis Lake Park to benefit that gang. During closing argument, the prosecutor acknowledged that he "d[id]n't believe" Uceda and his friends were actual members of MS-13, but argued Uceda's crimes still benefitted the gang by targeting actual or perceived rivals. The jury found the gang enhancement true as to the shooting at Ellis Lake Park but not true as to Janson's murder.

The trial court sentenced Uceda to 40 years to life for Janson's murder and five years for shooting J.R., to be served consecutively. The court dismissed the enhancements associated with J.R.'s shooting, including the gang enhancement. (§ 1385, subd. (c)(2)(B).)

15

## II.  DISCUSSION

### A.  *Instructional Errors*

Uceda claims the trial court prejudicially erred by failing to instruct the jury sua sponte on lesser included offenses of both crimes of which he was convicted.  We reject his argument as to Janson's murder, but there is merit to the argument with respect to the shooting of J.R. at Ellis Lake Park.

#### 1.  *Governing Legal Principles*

"Under the California Constitution's due process clause, a trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury."  (*People v. Choyce* (2025) 18 Cal.5th 86, 104.)  "Substantial evidence in this context is that which a reasonable jury could find persuasive," and the court "should resolve all doubts" in this regard "in favor of the accused."  (*Ibid.*)  "[C]redibility determinations should not inform the question."  (*Id.* at p. 106.)  Still, " '[s]peculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.' "  (*People v. Thomas* (2023) 14 Cal.5th 327, 385.)  We review the issue de novo.  (*Ibid.*)

#### 2.  *Failure to Instruct on Involuntary Manslaughter*

With regard to Janson's murder, Uceda claims substantial evidence supported instructing the jury on misdemeanor involuntary manslaughter, or another theory of involuntary manslaughter.

Manslaughter, an unlawful killing without malice (§ 192), is a lesser included offense of murder, an unlawful killing with malice (§ 187).  (*People v. Sevilla* (2025) 115 Cal.App.5th 618, 625, review den. (Jan. 14, 2026) (*Sevilla*).)  The statute describes involuntary manslaughter as including a killing during: (1) a misdemeanor or other "unlawful act, not amounting to a

felony" or (2) "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) Case authorities hold the crime also encompasses killings without malice in the course of certain felonies. (See *People v. Burroughs* (1984) 35 Cal.3d 824, 835 [a noninherently dangerous felony committed without due caution or circumspection], disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89 (*Blakeley*); *People v. Brothers* (2015) 236 Cal.App.4th 24, 33–34 (*Brothers*) [an inherently dangerous assaultive felony]; CALCRIM No. 580.) The mens rea associated with involuntary manslaughter is criminal negligence, meaning the defendant committed the "predicate act endangering human life without realizing the risk involved, when a reasonable person in the same position would have been aware of that risk." (*Sevilla, supra,* 115 Cal.App.5th at p. 627.)

Uceda claims the evidence concerning Janson's murder supported instructing the jury on a "brandishing" theory of misdemeanor involuntary manslaughter. (See *People v. Thomas* (2012) 53 Cal.4th 771, 814 ["an accidental shooting that occurs while the defendant is brandishing a firearm . . . could be involuntary manslaughter"], citing *People v. Lee* (1999) 20 Cal.4th 47, 60–61 (*Lee*).) Brandishing means drawing or exhibiting a firearm in the presence of another person "in a rude, angry, or threatening manner," or "in any manner[] unlawfully us[ing] a firearm in any fight or quarrel." (§ 417, subd. (a)(2).) We will assume Uceda brandished his weapon at some point during his confrontation with Janson. Still, there must be a "causal connection" between the misdemeanor and the victim's death for a killing to fit this theory. (See *People v. Penny* (1955) 44 Cal.2d 861, 868; see also *People v. Cox* (2000) 23 Cal.4th 665, 673 [misdemeanor involuntary

17

manslaughter requires that the " 'unlawful act *causing death* be committed "through criminal negligence," ' " italics added].)

Here, it is undisputed that Uceda killed Janson by, in his own words, "point[ing]" a semiautomatic gun at him and "fir[ing]"—once that Uceda remembered, and, he "believe[d]," four more times after that, each requiring another pull of the trigger. This was assault (§ 245): while Uceda at times claimed not to remember firing at Janson (telling police "the gun was just in his hand, and . . . kind of went off") and insisted he did not intend to kill him, he never said shooting Janson was an accident. (See *People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 207–211 [assault does not require a specific intent to cause injury; "[r]ather, the focus is on the 'offensive or dangerous character of the defendant's conduct' "].) There was no substantial evidence that mere brandishing was what caused Janson's death. (See *Sevilla, supra,* 115 Cal.App.5th at p. 627 [evidence about drawing or exhibiting a gun was "not substantial evidence of [the defendant's] mental state in firing the gun— or put another way, it [was] not substantial evidence that he was guilty *only* of misdemeanor brandishing"].)

Uceda also claims there was substantial evidence he "committed an unintentional homicide in the course of a non-inherently dangerous felony" under *Burroughs*. While he does not identify the felony he means or address whether it is inherently dangerous, we will assume that a killing during the commission of assault (§ 245) or grossly negligent discharge of a firearm (§ 246.3, subd. (a)) could support an involuntary manslaughter instruction under either *Burroughs* or *Brothers*. Uceda's claim still fails because there was no substantial evidence he shot Janson "*without* consciously realizing the risk to life posed by his decision to shoot." (*Sevilla, supra,* 115 Cal.App.5th at p. 629.)

18

As our colleagues in Division Four recently explained, the negligent handling or use of a firearm could be involuntary manslaughter if the defendant fired "unintentionally or lacked awareness about whether [the gun] was loaded." (*Sevilla, supra,* 115 Cal.App.5th at p. 628.) But where the defendant intentionally pulled the trigger of a loaded gun and shot towards a victim (and there was no evidence his "fear" or some other factor "rendered him unable to appreciate the harm" this action risked), the only reasonable inference is that he "acted with at least implied malice, i.e., that he realized and disregarded the risk posed by his actions."[2] (*Id.* at p. 630; see also *People v. Hendricks* (1988) 44 Cal.3d 635, 643 [where defendant shot victims multiple times at point-blank range, his "self-serving tape-recorded statements denying an intent to kill cannot be deemed substantial in character"]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145 [involuntary manslaughter instruction unwarranted where "defendant testified he 'fired' [a] shotgun at" the victim because the victim " 'took [his] life' "]; *People v. Gana* (2015) 236 Cal.App.4th 598, 606–607 [involuntary manslaughter

---

[2] We agree with our colleagues that *Lee*—where it was unclear exactly how the defendant came to shoot his wife when they quarreled behind a closed door—must be distinguished from these facts. (*Sevilla, supra,* 115 Cal.App.5th at p. 628–629.) So too must *People v. Glenn* (1991) 229 Cal.App.3d 1461, 1466, disapproved on another ground in *Blakeley, supra,* 23 Cal.4th 82, where the victim approached the defendant from behind and there was evidence that "in a reflex action, [the defendant] turned with [a] knife in his hand and [it] entered the victim's chest," but the defendant " 'didn't try to stick it.' " Likewise, in *People v. Clark* (1982) 130 Cal.App.3d 371, 376, abrogated by *Blakeley, supra,* 23 Cal.4th 82, the defendant was threatened and pursued by the victim, and his pistol "discharged into [the victim's] chest," but he then "attempted to give first aid to" the victim. In that context, the defendant's testimony that his gun "just went off" a single time was substantial evidence that he did not intend to shoot. (See *id.* at p. 382; *Sevilla, supra,* 115 Cal.App.5th at p. 628 [distinguishing *Glenn* and *Clark*].)

instruction unwarranted where defendant held a gun as victim entered the room and "[w]ithout saying anything, she shot [him] while still several feet away from him"; distinguishing cases where facts suggested an accidental discharge during a struggle or confrontation].) Under these circumstances, if the defendant "was guilty at all," it was "of the greater offense of second degree murder and not of the lesser included offense of involuntary manslaughter," and there was no duty to instruct on involuntary manslaughter. (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1028.)

As *Brothers* put it, "there is no sua sponte duty to instruct on involuntary manslaughter" where "the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger." (*Brothers*, *supra,* 236 Cal.App.4th at p. 35.) "Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence." (*Id.* at pp. 34–35 [no duty to instruct where defendant and associates beat victim until defendant "did not know whether [he] was alive or dead," citing lack of "evidence of an accidental killing, gross negligence or [the defendant]'s own lack of subjective understanding of the risk to [the victim]'s life that [this] conduct posed"].) That is not the law, and the evidence did not support the instruction here.

3.      *Failure to Instruct on Grossly Negligent Discharge of a Firearm*

As to the shooting at Ellis Lake Park, Uceda claims the trial court should have instructed on grossly negligent discharge of a firearm (§ 246.3, subd. (a)) as a lesser included offense of shooting from an occupied motor vehicle (§ 26100, subd. (c)). The People do not dispute that the former crime

20

is a lesser included offense of the latter, but urge substantial evidence did not support the instruction and any error was harmless.

Under the " 'elements' " test for a lesser included offense, we ask "whether all the statutory elements of the lesser offense are included within those of the greater offense" so that the greater "crime cannot be committed without also committing [the] lesser offense." (*People v. Ramirez* (2009) 45 Cal.4th 980, 985 (*Ramirez*); *People v. Gonzalez* (2018) 5 Cal.5th 186, 197 (*Gonzalez*) [court must instruct on a lesser included offense where either the "elements test" or the "accusatory pleading test" is satisfied].) The elements of section 246.3, subdivision (a) are the intentional discharge of a firearm in a grossly negligent manner which could result in the injury or death of a person. (*Ramirez*, at p. 986; CALCRIM No. 970.) Section 26100, subdivision (c) requires a willful and malicious shooting from a motor vehicle at a person outside the vehicle. (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1167–1168; CALCRIM No. 968.) Both are general intent crimes. (*Ramirez,* at p. 990; *Rodarte*, at p. 1168.)

*Ramirez* addressed an analogous situation, holding that section 246.3 is a lesser included offense of section 246, willfully and maliciously shooting at an inhabited dwelling house or other inhabited or occupied target. (*Ramirez, supra,* 45 Cal.4th at p. 990; see *People v. Iraheta* (2014) 227 Cal.App.4th 611, 624 [explaining that section 26100, subdivision (c) was patterned after section 246].) As *Ramirez* explained, while their mens rea requirements are differently described, both offenses are general intent crimes that require the defendant to willfully fire a gun. (*Ramirez, supra,* 45 Cal.4th at p. 990.) "The high probability of human death or personal injury in section 246 is similar" but "greater than, the formulation of likelihood in section 246.3(a), which requires that injury or death 'could result.' " (*Ibid.*) "The only other

21

difference between the two, and the basis for the more serious treatment of a section 246 offense, is that the greater offense requires that an inhabited dwelling or other specified object be within the defendant's firing range. All the elements of section 246.3(a) are necessarily included in the more stringent requirements of section 246." (*Ibid.*) Likewise, a violation of section 26100, subdivision (c) requires that a person be in the defendant's firing range and the defendant fire from a vehicle: the other elements are the same or greater than those of section 246.3, subdivision (a).

Next, we must consider whether there was substantial evidence that Uceda violated only section 246.3, subdivision (a) and not section 26100, subdivision (c). (*People v. Choyce, supra,* 18 Cal.5th at p. 104.) There is no dispute that he shot J.R. from a motor vehicle, so the issue is whether he necessarily shot "at" a person within the meaning of section 26100, subdivision (c). As our Supreme Court has explained, this element requires shooting "in the direction of or towards" a prohibited target. (*People v. Manzo* (2012) 53 Cal.4th 880, 885 [construing section 246].) This means a target must be "within the defendant's firing range," whereas a violation of section 246.3 requires only "the likely presence of people in the area, not the actual presence of a specific person." (*Ramirez, supra,* 45 Cal.4th at pp. 986–987, 990.) But the defendant need not shoot " 'directly "at" ' " a target to be guilty of the greater offense: the element includes shooting " 'in such close proximity to the target that [it] shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it.' " (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1501 [discussing former section 12034, subdivision (c), the predecessor to section 26100, subdivision (c)].) "Thus, to find defendant guilty of section 246.3, subdivision (a) but not" section 26100, subdivision (c), "the jury would

have had to find that defendant's shots were not aimed at or ' " 'in close proximity to' " ' " a target. (*People v. Bell* (2019) 7 Cal.5th 70, 109–110 [discussing section 246 and finding no duty to instruct on section 246.3, subdivision (a) where there was "no evidence that defendant fired . . . into the air"].)

That was possible on this record. Uceda testified that at Ellis Lake Park, he intentionally fired a first shot "into the air," then accidentally fired another shot when he "hit against the window" while moving his hand. He claimed "[t]here was nobody at the parking area" when he fired. He said he did not know J.R. or want to shoot her, and there was no evidence to the contrary. While the jury rejected part of this testimony and found Uceda hit J.R. with a shot that was intentionally fired, it made no finding about where he was aiming: whether into the air, at the ground like Uceda described doing when confronting Janson near his high school, or into the park at the group in red. Meanwhile, the evidence that Uceda intended to target the group in red in the sense intended by section 26100, subdivision (c)—by shooting in close proximity to someone in that group as discussed in *Hernandez* and *Bell*—is not conclusive. If Uceda merely shot into the air or at the ground in an area he believed to be unoccupied and that was not in close proximity to the group in red or another target, he would be guilty of violating section 246.3, subdivision (a) but not section 26100, subdivision (c). And the record is not clear about exactly where the group in red was located relative to Uceda's gunfire. H.C. testified that Uceda's group "said that a group was there" in the park as they drove by just before the shooting, and a responding officer testified that a group in red was "in the street" near the bus stop when she arrived to the scene after the shooting, but no evidence conclusively placed the group in Uceda's firing range. In this context,

23

Uceda's testimony was substantial evidence that would have allowed the jury to infer the group in red was near enough that they could have been injured or killed by Uceda's gunfire, but not necessarily within the firing range contemplated by section 26100, subdivision (c).

*People v. Overman* (2005) 126 Cal.App.4th 1344 (*Overman*), another case construing section 246, is instructive.[3] There, the defendant fired shots in the area of his workplace, while outside in his car. (*Id.* at pp. 1351–1352.) Some of his coworkers initially told police the defendant fired while aiming his rifle at the workplace, but testified at trial that they did not *see* the rifle fired and only *heard* gunshots. (*Id.* at pp. 1351–1354.) Two bullet casings were recovered from the street, but no bullet holes or impacts to the workplace or surrounding objects were discovered. (*Id.* at p. 1353.) The defendant did not testify: the defense theory was that he shot into the air, and defense counsel highlighted evidence that he was an excellent marksman and the rifle he fired was accurate. (*Id.* at pp. 1354–1355.)

The trial court failed to instruct on section 246.3, subdivision (a), and the Court of Appeal reversed the defendant's conviction under section 246, explaining that the record also would have allowed the jury to "infer that defendant fired his rifle *away* from the . . . range of the occupied office building."[4] (*Overman, supra,* 126 Cal.App.4th at pp. 1358, 1362–1363.) Because he was still "in the general vicinity of several persons," the jury

---

[3] *Overman* was cited with approval by our Supreme Court in *People v. Manzo, supra,* 53 Cal.4th at p. 888.

[4] We omit *Overman*'s alternative reference to the "general vicinity" of the building as potentially misleading. *Overman* employed the term to refer to the firing range targeted by a shooter in violation of section 246 *and* to describe the requisite proximity of a grossly negligent discharge presenting a risk of injury or death in violation of section 246.3. (*Overman, supra,* 126 Cal.App.4th at pp. 1361, 1363.)

could have found he fired "under circumstances showing a grossly negligent disregard for human life, a violation of section 246.3, but not directly at or in close proximity to an occupied building, a violation of section 246." (*Id.* at p. 1363.) Applying the standard described in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) to find prejudice, the Court of Appeal found it "reasonably probable that the jury would have convicted defendant of the lesser included offense of violating section 246.3." (*Overman, supra,* 126 Cal.App.4th at p. 1363.) It reasoned that "the evidence that defendant shot either directly at or in the . . . range of an occupied building was not unequivocal." (*Ibid.*)

The evidence concerning the shooting at Ellis Lake Park is analogous, and the trial court's error was prejudicial under *Watson*.[5] As we have explained, the evidence that Uceda "shot either directly at or in the . . . range of" the group in red "was not unequivocal." (*Overman, supra,* 126 Cal.App.4th at p. 1363.) Uceda claimed he fired into the air when "[t]here was nobody at the parking area," and the group in red was not standing there at the time. It was not the group in red that Uceda hit, but a bystander who was a stranger to him, supporting his testimony that he did not mean to hit anyone but "just wanted to fire into the air." "[T]he jury was

---

[5] Uceda claims the error amounted to misinstruction on an element of the charged offense, so that we must reverse unless the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18. The People disagree. "[W]e need not resolve this dispute," because the instructional error "was prejudicial even under the less stringent standard set out in *Watson.*" (*People v. Hendrix* (2022) 13 Cal.5th 933, 944.) Under that standard, a reviewing court must reverse if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.) This " ' " 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " ' " (*Hendrix,* at p. 944.)

not required to . . . fully credit" Uceda's version of events to find in his favor on this critical point. (*People v. Brown* (2016) 245 Cal.App.4th 140, 154 (*Brown*), disapproved on another ground in *People v. Morgan* (Feb. 26, 2026, No. S286493) ___ Cal.5th ___ [p. 2].)

The People urge any error in failing to instruct on grossly negligent discharge of a firearm was harmless because the evidence of Uceda's guilt was strong, his own testimony was weak, and the jury was properly instructed on the theories counsel argued at trial. This argument misapprehends the trial court's duty to instruct the jury on lesser included offenses. Such instruction is required to expose the jury "to 'the full range of possible verdicts—not limited by the strategy, ignorance, or mistake of the parties.' " (*Gonzalez, supra,* 5 Cal.5th at p. 196.) This " 'ensure[s] that the verdict is no harsher or more lenient than the evidence merits,' " and avoids " ' "forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other," ' " removing any risk that the jury " 'might be tempted to convict the defendant " 'of a greater offense than that established by the evidence' " rather than acquit the defendant altogether.' " (*Id.* at pp. 196–197; *Brown, supra,* 245 Cal.App.4th at pp. 153–154 [" ' "courts are not gambling halls but forums for the discovery of truth," ' " which may fall between " 'the defendant's protestations of innocence' " and the prosecutor's charge].) For these reasons, "in assessing prejudice, 'it does not matter that the jury chose to convict the defendant of the greater offense over acquittal or that the defendant was convicted of the greater offense on sufficient evidence.' " (*Id.* at p. 155.) "To hold otherwise would undermine the very purpose of the sua sponte rule" for instruction on lesser included offenses. (*Ibid.*)

Uceda's conviction under section 26100, subdivision (c) must be reversed. Still, there was overwhelming evidence that Uceda committed the lesser offense under section 246.3, subdivision (a), which he does not dispute. "When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense." (*People v. Kelly* (1992) 1 Cal.4th 495, 528, citing section 1260; *Brown*, *supra*, 245 Cal.App.4th at pp. 155–156.) On remand, we allow the prosecutor that option as indicated below.

## B. Gang Enhancement

Finally, Uceda claims the finding that the Ellis Lake Park shooting was committed for the benefit of a criminal street gang was unsupported by substantial evidence. We are not persuaded.[6]

Uceda's 2023 trial followed the enactment of Assembly Bill No. 333 (2021–2022 Reg. Sess.), which amended section 186.22 to clarify what it means to "benefit, promote, further, or assist" a criminal street gang. As amended, section 186.22 requires that an offense commonly benefitted a gang and the benefit was more than reputational. (Stats. 2021, ch. 699, §§ 3, 4; § 186.22, subd. (g).) Qualifying benefits "may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang

---

[6] As the parties did not brief this issue on appeal, on remand, the trial court should address in the first instance the status of the gang enhancement if the underlying conviction is reduced to grossly negligent discharge of a firearm. In addition, we observe that Uceda was charged with a gang enhancement under section 186.22, subdivision (b)(1)(C), but the verdict form and minute orders reflect a greater enhancement under section 186.22, subdivision (b)(5) was imposed. The latter subdivision does not apply to convictions under either section 26100, subdivision (c) or section 246.3, subdivision (a), so an enhancement under section 186.22, subdivision (b)(5) cannot stand.

rival, or intimidation or silencing of a . . . witness or informant." (§ 186.22, subd. (g).) Here, the trial court properly instructed the jury on the elements of the new law. Still, Uceda claims the evidence was insufficient to show more than a reputational benefit to MS-13 because he and his friends were not yet members and there was no evidence to show the shooting took place in disputed territory or the targets were from rival gangs.

When considering a challenge to the sufficiency of the evidence to support a conviction or special circumstance finding, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the [essential elements] beyond a reasonable doubt.' " (*People v. Cardenas* (2025) 18 Cal.5th 797, 821.) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*Ibid.*) "This determination 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid.*)

Here, there was ample evidence that the Ellis Lake Park shooting "target[ed] a perceived or actual gang rival."[7] (§ 186.22, subd. (g).) The shooting followed a confrontation in which a group wearing red "came at" Uceda's group and K.G. fired a BB gun at them. Uceda himself testified that

---

[7] Section 186.22, subdivision (g) provides examples of how *any* felony committed to benefit, promote, further, or assist a gang may be proven as conduct that is more than reputational. (See § 186.22, subd. (b).) Thus, a finding that rivals were "target[ed]" for purposes of section 186.22, subdivision (g) does not necessarily mean they were targeted under section 26100, subdivision (c).

the group in red was "flashing signs," and K.G. made an MS-13 sign. Uceda's group went to the park after K.G. "said the Nortenos are at the park" and "he was going to fire again at them." Y.P. followed, filming a video in which he said, "[W]e came to see some enemies." After the shooting, Uceda's group went to San Francisco to meet members of MS-13. This is more than enough to show Uceda's crime commonly benefited MS-13 by targeting perceived or actual rivals. (See *People v. Cortez* (2025) 114 Cal.App.5th 1201, 1211, [substantial evidence supported gang findings; " 'targeting a perceived or actual gang rival' " is "listed in the amended statute as [a] benefit[] that may be considered 'more than reputational' "].)[8]

## III. DISPOSITION

The judgment is affirmed with respect to the murder conviction and its special allegation. As to the conviction under section 26100, subdivision (c), the judgment is reversed for further proceedings consistent with this opinion, with additional directions as follows: Unless the speedy trial right is waived by Uceda, if the People do not bring him to trial within 60 days after the filing of the remittitur in the trial court per section 1382, subdivision (a)(2), the trial court shall proceed as if the remittitur were a modification of the

---

[8] We distinguish *People v. Hin* (2025) 17 Cal.5th 401, 467, which found no substantial evidence to support gang findings under prior law absent evidence that the victims "were members of a rival gang or were targeted for a gang-related reason," or that perpetrators "said or did anything to indicate their membership" in a gang; *People v. Lamb* (2024) 16 Cal.5th 400, 453–455, which held a failure to instruct on the new requirements under section 186.22 was not harmless beyond a reasonable doubt where the record lacked details of specific offenses sufficient to preclude an inference that any benefit to the gang was merely reputational, noting that "[w]ere this a question of sufficiency of the evidence, the outcome might be different"; and *People v. Gonzalez* (2021) 59 Cal.App.5th 643, 649, where a "gang expert had no logical basis for his opinion" because "nothing linked the[] crimes to a gang."

judgment to reflect a conviction in that count of grossly negligent discharge of a firearm (§ 246.3, subd. (a)), and shall resentence Uceda accordingly.  (See *People v. Kelly*, *supra*, 1 Cal.4th at p. 528.)

_____
SMILEY, J.

WE CONCUR:


_____
HUMES, P. J.


_____
BANKE, J.

*People v. Uceda* / A168345

Trial Court:       Contra Costa County Superior Court

Trial Judge:       Hon. John William Kennedy

Counsel:

Jennifer A. Mannix under appointment by Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General of California, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, and Timothy Moore, Deputy Attorney General for Plaintiff and Respondent.

*People v. Uceda* / A168345